# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

CAMERON D., individually and as     ]
father and next friend of J.D., a minor,     ]
                                      ]
      Plaintiffs,                     ]
                                      ]
v.                                       ]         4:17-cv-00022-ACA
                                        ]
ARAB CITY BOARD OF           ]
EDUCATION, et al.,               ]
                                      ]
      Defendants.                   ]

## MEMORANDUM OPINION

This matter comes before the court on Defendants' motion for summary judgment. (Doc. 45).

Plaintiffs in this case are a minor, J.D., who is developmentally delayed, and his father, Cameron D. Based on events that took place during J.D.'s second year of kindergarten at the Arab Primary School, Plaintiffs filed suit against the Arab City Board of Education, Dr. Leah Keith, Patrick Crowder, Callie Cranford, Tracey Putman, and Margaret Eddie. Dr. Keith was the principal of the Arab Primary School; Mr. Crowder was the school's special education coordinator; Ms. Cranford was J.D.'s kindergarten teacher during at least part of the 2015–2016 school year; Ms. Putman was J.D.'s paraprofessional aide during the 2014–2015 and 2015–2016 school years; and Ms. Eddie was the school's head custodian.

(Doc. 47-20 at 2; Doc. 47-22 at 2; Doc. 47-23 at 2; Doc. 49-39 at 63–64; Doc. 47-21 at 1).

After Plaintiffs filed against the Board of Education an administrative complaint under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.,* they moved to Mississippi, where J.D. now attends school. A hearing officer denied Plaintiffs' administrative complaint against the Board, and Plaintiffs appeal that decision, while also raising claims under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and Alabama law.

Specifically, in addition to their IDEA appeal, Plaintiffs assert that:

(1) the Board of Education violated the ADA and Section 504[1];

(2) the Board of Education is liable for negligence, false imprisonment, harassment, assault, and battery;

(3) Ms. Cranford and Ms. Putman, in their individual capacities, are liable for false imprisonment, harassment, assault, and battery;

(4) Ms. Eddie, in her individual capacity, is liable for assault and battery; and

(5) Dr. Keith and Mr. Crowder, in their individual capacities, are liable for negligence.

---

[1] Although the complaint does not list which counts relate to which defendants, Plaintiffs' counsel stated at a hearing the ADA and Section 504 claims are asserted against only the Board of Education. (Tr. at 35).

After the parties briefed the motion and the court held a motion hearing, the court took the motion under submission. The court **WILL GRANT** the motion for summary judgment. The court **WILL DISMISS AS MOOT** Plaintiffs' appeal of the IDEA complaint because J.D. is no longer a student at the Arab Primary School. The court **WILL DISMISS WITHOUT PREJUDICE** the state law claims against the Board of Education because sovereign immunity bars those claims. The court **WILL DISMISS WITHOUT PREJUDICE** the state law claims against Ms. Cranford, Ms. Putman, Ms. Eddie, Dr. Keith, and Mr. Crowder because those defendants are entitled to state agent immunity. The court **WILL GRANT SUMMARY JUDGMENT** in favor of the Board of Education and against Plaintiffs on the ADA and Section 504 claims because Plaintiffs have presented no evidence creating a genuine dispute of material fact about whether Defendants intentionally discriminated against J.D.

## I.  STATUTORY FRAMEWORK

Plaintiffs allege the Board of Education violated the IDEA. The IDEA has many purposes, but relevant to this case, it was enacted "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living," and "to ensure that the rights of children with disabilities and parents of

such children are protected." 20 U.S.C. § 1400(d)(1)(A)–(B). To accomplish that purpose, the school and the parents of a disabled child develop what is known as an individualized education program that describes, among other information, the child's current levels of academic achievement and functional performance and "an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class." 20 U.S.C. §§ 1414(d)(1)(A)(i), 1414(d)(1)(B); *see also Ortega v. Bibb Cty. Sch. Dist.*, 397 F.3d 1321, 1324 (11th Cir. 2005).

A parent may file an administrative complaint about "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6). Once a parent has filed an administrative complaint, "the parents or the local educational agency involved in such complaint shall have an opportunity for an impartial due process hearing, which shall be conducted by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency." 20 U.S.C. § 1415(f)(1)(A). In Alabama, the State Superintendent of Education appoints a hearing officer to conduct the due process hearing. Ala. Admin. Code R. 290-8-9-.08(9)(c)4. Parents may appeal the decision of the administrative hearing office to the district court, where the court

will review *de novo* the complaint and may hear additional evidence if necessary. 20 U.S.C. § 1415(i)(2)(A).

The other federal statutes that Plaintiffs say Defendants violated are Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. Title II of the ADA provides that "no qualified individual with a disability shall, by reasons of such disability, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act provides in relevant part that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). "Discrimination claims under the ADA and the Rehabilitation Act are governed by the same standards, and the two claims are generally discussed together." *J.S., III by & through J.S. Jr. v. Houston Cty. Bd. of Educ.*, 877 F.3d 979, 985 (11th Cir. 2017).

The distinction between an IDEA claim and an ADA/Section 504 claim is that "[t]he IDEA guarantees individually tailored educational services, whereas Title II and § 504 promise non-discriminatory access to public institutions—specifically aiming to root out disability-based discrimination, enabling each

covered person to participate equally to all others in public facilities and federally funded programs." *Id.* at 987 (quotation marks and alteration omitted).

## II.    BACKGROUND

In deciding a motion for summary judgment, the court must first determine if the parties genuinely dispute any material facts, and if they do not, whether the moving party is entitled to judgment as a matter of law.[2]  Fed. R. Civ. P. 56(a). Under Rule 56, the court "draw[s] all inferences and review[s] all evidence in the light most favorable to the non-moving party."  *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012) (quotation marks omitted).

Both parties submitted evidence in relation to this motion for summary judgment.  Plaintiffs' brief in opposition to summary judgment, however, also relies on materials that the court cannot consider in deciding the motion.  Most notably, Plaintiffs argue that the court should conclude that disputes of material fact exist because one witness, Melanie Collier, made statements to plaintiffs' counsel that contradict her sworn deposition testimony.  (Doc. 50 at 12–13).  But Plaintiffs present nothing other than allegations in their brief that Ms. Collier made those contradictory statements, and the court cannot consider allegations in a brief

---

[2] Defendants contend that as to the state law claims, the court must use Alabama's approach to determining motions for summary judgment.  (Doc. 46 at 20–22).  This is incorrect.  The court must use the federal standard in determining whether the grant summary judgment, even as to state law claims. *See Lighting Fixture & Elec. Supply Co. v. Cont'l Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir. 1969).

as evidence at the summary judgment stage. *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The court has drawn its description of the facts from the *evidence* submitted in support of and opposition to Defendants' motion for summary judgment. Taken in the light most favorable to Plaintiffs, those facts are as follows.

At the beginning of the 2014–2015 school year, J.D., then a four-year-old who lived with his grandmother, Janet Thompson, began kindergarten at the Arab Primary School. (Doc. 46 at 10; *see* Doc. 47-26 at 11). The Arab City Board of Education ("Board") soon determined that J.D. was eligible for special education and related services because he was developmentally delayed, and assigned Abby Brown to be J.D.'s special education teacher.[3] (Doc. 49-17 at 14; Doc. 49-38 at 37, 40; Doc. 49-39 at 35). Near the end of the school year, J.D.'s IEP team decided that J.D. would repeat kindergarten during the 2015–2016 school year because he had not mastered the standards required to be promoted to first grade. (Doc. 49-38 at 37, 49–50; Doc. 49-39 at 35–37; Doc. 49-53 at 37).

At the beginning of the 2015–2016 school year, Defendant Callie Cranford was assigned as J.D.'s special education teacher; Angela Hill was assigned as his

---

[3] Ms. Brown's last name is now Huff, but for consistency, the court will refer to her as "Ms. Brown."

general education teacher; and Defendant Tracey Putman was assigned as his aide. (Doc. 49-39 at 61, 63–64; Doc. 49-48 at 21, 22–23; Doc. 47-22 at 2). From October 2015 through March 2016, teachers and staff at Arab Primary School documented disciplinary problems with J.D., such as him hitting, punching, kicking, head-butting, pulling hair of teachers and students; spitting at people; throwing rocks and chairs; rolling on the ground; screaming; and on one occasion, exposing himself. (Doc. 49-18 at 14–16, 23–35; Doc. 49-19 at 1–31).

This case concerns what happened during the 2015–2016 school year—J.D.'s second year of kindergarten—and primarily involves Ms. Cranford's method of putting J.D. in timeout, the school reassigning J.D. from Ms. Cranford's classroom to Ms. Brown's, the school's use of "transport restraint" to move J.D. from one place to another, and one particular incident which eventually led J.D.'s family to take him out of school and place him on homebound services for the rest of the school year.

### A. Timeouts in the Rifton Chair

Ms. Cranford testified that she occasionally had J.D. sit in a child-sized Rifton chair for a two-minute timeout when he was misbehaving. (Doc. 49-47 at 45–46). A Rifton chair is a wooden adaptive chair meant to be used by people with certain physical disabilities. It has a cloth strap with a three-prong buckle at the waist. (*Id.* at 46; Doc. 47-19 at 7). Although J.D. had no physical need for a

Rifton chair, Ms. Cranford would have him sit in it because when he sat in a normal chair, he would "slump out of the sides," and he had a tendency to "rock the chairs and flip them over." (Doc. 49-47 at 45–47).

The Arab Primary School had two Rifton chairs, one that had been modified to be more stable and one that was unmodified. (Doc. 47-19 at 3). The parties dispute several facts relating to these Rifton chairs, including: (1) which teachers used a Rifton chair for timeouts; (2) which of the two chairs stored at the school were used for J.D.'s timeouts, (3) how many times J.D. was made to sit in a Rifton chair for a timeout, and (4) whether J.D. could unbuckle himself or get out of the chair on his own. (*See* Doc. 46 at 1; Doc. 50 at 12).

Plaintiffs allege that Ms. Brown and Ms. Crawford used the modified Rifton chair for J.D.'s timeouts. (*See* Doc. 50 at 11–13). But they present no evidence that Ms. Brown ever put J.D. in a timeout at all; that anyone other than Ms. Cranford put J.D. in timeouts; or that when Ms. Cranford and Ms. Putman put J.D. in a timeout, they used the modified Rifton chair. Even viewing the evidence in the light most favorable to Plaintiffs, the court cannot find that a genuine dispute exists about who put J.D. in a Rifton chair or which chair was used. *See Hamilton*, 680 F.3d at 1318. Instead, all of the evidence indicates that Ms. Cranford and Ms. Putman used the unmodified chair for J.D.'s timeouts. (*See* Doc. 47-19 at 3; Doc. 49-18 at 1, 10; Doc. 50-1 at 20–21; Doc. 50-3 at 12–13).

Next, Plaintiffs allege that J.D. was put in the Rifton chair ten to twenty times; but again, they present no evidence in support of that allegation, relying instead on statements made in their brief. (*See* Doc. 50 at 12). The court cannot consider those statements in determining whether a genuine dispute of material fact exists. *See* Fed. R. Civ. P. 56(e). Instead, the undisputed evidence shows that Ms. Cranford and Ms. Putman had J.D. sit in the Rifton chair for a timeout on three occasions. (Doc. 49-46 at 75; Doc. 49-47 at 1, 45–46; Doc. 50-1 at 22).

The first two times Ms. Cranford used the Rifton chair were in October or November 2015, and the last time was in January 2016. (Doc. 49-47 at 45–46.). Ms. Cranford testified that on the first occasion, she buckled J.D. into the chair; on the second occasion, he buckled himself in; and on the third occasion, the strap was not buckled. (Doc. 49-47 at 47; Doc. 48-48 at 4). In addition, Ms. Putman, J.D.'s paraprofessional aide, testified that she assisted in strapping J.D. into the Rifton chair three times. (Doc. 49-47 at 2). Accordingly, Plaintiffs have failed to meet their burden of establishing a genuine dispute of material fact about the number of times J.D. was put in the Rifton chair for a timeout.

Finally, Plaintiffs allege that J.D. could not unbuckle the chair or remove himself from it without help. (Doc. 50 at 11–12). Ms. Putman testified that J.D. was "easily" able to unbuckle the chair, and both Ms. Cranford and Ms. Putman testified that J.D. could "freely" get himself out of the chair. (Doc. 49-47 at 4, 14;

Doc. 49-48 at 8).  But another paraprofessional aide, Ms. Collier, testified that although J.D. "might could unbuckle himself, . . . that chair was too small for him. . . .  So he—he would have turned it over or he had to have help to get out of that.  Now, I'm sure he could unbuckle it. . . .  But getting out was a different— was altogether different."  (Doc. 50-1 at 22).  Because a conflict exists about whether J.D. could get out of the chair by himself, the court accepts as true the evidence that although J.D. could unbuckle the strap, he could not extricate himself from the chair without help.

According to a letter prepared by Dr. Keith, Ms. Thompson contacted Dr. Keith on February 6, 2016, and stated that "she did not want [J.D.] to have access to or be placed in the [Rifton] chair . .  for any reason."  (Doc. 49-59 at 40). As a result, Dr. Keith had the chair removed from J.D.'s special education classroom and she instructed the teachers that "the chair at issue (or any such chair orthopedic or medical support chair [sic]) could under no circumstances be utilized to address behavioral issues with a student."  (*Id.*).

B.    Reassignment to Ms. Brown's "Self-Contained" Classroom

Although he had some disciplinary problems beginning in October 2015, Ms. Cranford—J.D.'s special education teacher at the time—testified that his behavioral issues began escalating in February 2016.  (Doc. 49-47 at 27–28).  On March 8, 2015, Dr. Keith sent a number of school employees an email stating:

I spoke with Janet [Thompson] [J.D.'s grandmother] this afternoon. We discussed having [J.D.] moved to Abby Brown's self-contained classroom instead of the regular education classroom to manage his behavior since we experienced success with the approach last year. She was agreeable; therefore, we will try it. If we are successful, we will change his case manager to Abby. He will need to complete the same classwork as Ms. Hill's other students.

(Doc. 49-19 at 29). Several teachers testified that a "self-contained classroom" is one in which the students remain all day. (Doc. 49-48 at 20; *see also* Doc. 49-40 at 14–15). Ms. Brown testified that, despite the reference to her classroom being self-contained, it was not actually self-contained because the students come and go between their special education classes and their general education classes. (Doc. 49-38 at 46–48).

The day after Dr. Keith sent that email, the school assigned Ms. Brown as J.D.'s special education teacher, and she remained his teacher until March 30, 2016. (Doc. 49-39 at 5, 48).

C.    Transport Restraint

Plaintiffs also challenge the school's use of transport restraint to move J.D. when he was resistant to instructions to go to the front office. Dr. Keith described the method as "involv[ing] physical support being provided by a trained individual to a child's shoulder and elbows so as to prevent injury while being escorted to another location." (*See* Doc. 49-59 at 36). Plaintiffs contend that no one at Arab

Primary School was trained in this method of transportation, so they could not use it on J.D.  (Doc. 50 at 15).

On March 30, 2016, J.D. misbehaved at recess by hitting another child and throwing rocks in the air, and as a result, Ms. Brown and a paraprofessional aide named Katherine Spencer brought J.D. back to the office using transport restraint.[4] (Doc. 49-49 at 42).  A video taken in the front office that day shows Ms. Brown and Ms. Spencer walking J.D. into the school's front office, each holding one of his arms.  (Exh. G-1 at 20:44–20:58).  J.D., resistant, walks forward with reluctance until shortly after they enter the office, at which point he comes to a complete stop and drops down to sit on the ground.  (*Id.* at 20:57–21:11).  At that point the teachers leave him sitting on the ground.  (*Id.*).

Although Plaintiff's briefing is not entirely clear, they appear to challenge only the use of transport restraint on this occasion.  (*See generally* Docs. 12, 50).

D.  <u>March 30, 2018</u>

Plaintiffs challenge the school's and its employee's actions on March 30 for more than just their use of transport restraint.  After Ms. Brown and Ms. Spencer transported J.D. to the front office, he moved in front of the office's door.  (Exh. G-1 at 21:11–21:32).  The school's head custodian, Defendant Margaret Eddie,

---

[4] The hearing officer stated that the paraprofessional aide was Ms. Putman, but Dr. Keith testified that the person in the video was Ms. Spencer. (*See* Doc. 49-1 at 35; Doc. 49-49 at 42).  There is no evidence indicating that Ms. Putman was involved in the March 30 transport of J.D.

approached him where he sat and nudged him four times with her foot. (Exh. G-2 at 00:15–00:24). J.D. does not react to her action. (*Id.*). Plaintiffs contend that this constitutes evidence that Ms. Eddie kicked J.D. (Doc. 50 at 15).

After the interaction with Ms. Eddie, J.D. continued to crawl and run around the office, hitting the door and walls, tipping over chairs, and throwing or knocking objects off desks. (Exh. G-2 at 00:47–15:01). Eventually his grandmother, Ms. Thompson, came to the office and instructed J.D. to pick up after himself. (Exh. G-3 at 00:01–7:00; *see also* Doc. 49-50 at 14). He and Ms. Thompson went into Dr. Keith's office. (Exh. G-3 at 8:30–11:15). The video does not show what went on inside Dr. Keith's office, but it does show Ms. Brown standing outside the open door. (*Id.*).

The video does not have audio recording, but Dr. Keith testified that, during this portion of the video, Ms. Thompson told J.D. to apologize and Ms. Brown asked him to tell everyone what he was sorry for. (Doc. 49-50 at 17). J.D. responded "buckle chair," and Ms. Brown said that J.D. had never sat in a buckle chair in her classroom. (Doc. 49-49 at 44). According to Dr. Keith, Ms. Thompson said not to call J.D. a liar and that "he was being subjected to abuse." (*Id.*). Ms. Brown said that she did not like how Ms. Thompson was speaking to her. (*Id.*). At that point, Dr. Keith told Ms. Brown to go back to her classroom. (*Id.* at 45–46). The video shows Dr. Keith appearing in the door and

touching Ms. Brown on the shoulder. (Exh. G-3 at 11:15-11:26). Ms. Brown left the office. (*Id.*).

For her part, Ms. Thompson testified that, while she and J.D. were in Dr. Keith's office, Ms. Brown "stood in Ms. Keith's office in [J.D.]'s face, pointing in his face, telling him he's a liar, hollering at him and telling him to tell me that that buckle chair was not used for him anymore." (Doc. 49-46 at 20, 33). She testified that "Ms. Keith had to scream at her own teacher twice to go back to her classroom because her teacher was screaming and up in our faces." (*Id.* at 33–34). But the video evidence directly contradicts Ms. Thompson's testimony, as it shows Ms. Brown standing still in the doorway to Dr. Keith's office.

Dr. Keith testified that, based on Ms. Thompson's allegation of abuse, she investigated and prepared a written report. (Doc. 49-49 at 37–38). During her investigation, she spoke with Ms. Thompson about her concerns and "questioned everyone involved." (*Id.* at 38). She later prepared a letter addressing "the reported incidents that [Mr. D] or others have raised on behalf of [J.D.]." (Doc. 49-59 at 36–41).

E.    The Aftermath

After the March 30 incident, J.D. returned to Ms. Cranford's classroom from Ms. Brown's classroom, but he attended only a few days of school. (Doc. 49-47 at 30–31; Doc. 49-48 at 2–3). At that point, he began receiving homebound services.

(Doc. 49-45 at 6). On June 27, 2016, Mr. D and his son moved to Mississippi, where they began living with Mr. D's fiancée. (Doc. 49-44 at 22, 24). Mr. D testified at the due process hearing that, three weeks into the new school year at his new school in Mississippi, J.D. was not experiencing any behavioral issues. (*Id.* at 16).

F.     Procedural History

On March 22, 2018, Mr. D, through counsel, submitted a request for an impartial due process hearing under the IDEA. (Doc. 49-6 at 18; Doc. 49-5 at 73). In an amended due process complaint filed soon after, Mr. D requested various forms of injunctive relief as well as compensation for private education "[i]f [the] system cannot provide a Free Appropriate Public Education to meet [the] student's needs." (Doc. 49-6 at 1).

At the conclusion of the hearing, the hearing officer issued a lengthy written opinion denying Mr. D's complaint. (Doc. 49-1 at 7–69). Mr. D then filed a judicial complaint in this court, appealing the hearing officer's decision and raising the ADA, Rehabilitation Act, and state law claims now before the court. (Doc. 1). The operative pleading is an amended complaint filed in March 2017. (Doc. 12).

III.   DISCUSSION

Defendants move for summary judgment. (Doc. 45). Because this case involves both an IDEA appeal and original claims, the standard under which the

court must analyze Defendants' arguments is different from the usual summary judgment standard. *See Loren F ex rel. Fisher v. Atlanta Indep. Sch. Sys.*, 349 F.3d 1309, 1313 (11th Cir. 2003) ("The [Federal Rule of Civil Procedure] 56 summary judgment principles do not apply in an IDEA case."). Accordingly, the court will address the IDEA appeal before moving on to the non-IDEA claims.

A.    IDEA Appeal

In their briefs on the motion for summary judgment, the parties argued the merits of the hearing officer's denial of Mr. D's amended due process complaint. They did not address the effect of Mr. D and J.D.'s move to Mississippi. But the court has "an obligation to notice and decide mootness issues." *United States v. Sec'y, Fla. Dep't of Corrs.*, 778 F.3d 1223, 1226 (11th Cir. 2015). Accordingly, the court ordered the parties to address, at a motion hearing, whether J.D.'s transfer to a school in Mississippi moots the appeal of the administrative decision. (Doc. 77). They did so, and the court now concludes that the IDEA appeal is moot.

"Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies." *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990). "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). "A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the

prevailing party."  *Knox v. Serv. Employees Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (quotation marks omitted).  In Mr. D's amended judicial complaint, he requested both injunctive and monetary relief.  (Doc. 12 at 16–17).  Accordingly, the court must address whether the move to Mississippi moots any or all of those requests.

The court concludes that Mr. D's requests for injunctive relief are moot. J.D. has moved to Mississippi, where he is currently enrolled in school.  (Doc. 49-44 at 16, 22, 24).  Even if the Arab Primary School's past treatment of him violated the IDEA, injunctive relief could not afford him any "effectual relief" because he is no longer a student at the school.  *See Knox*, 567 U.S. at 307; *Bd. of Educ. of Oak Park v. Nathan R., ex rel. Richard R.*, 199 F.3d 377, 381 (7th Cir. 2000) ("[The action is now moot due to Nathan's graduation from high school.  Nathan graduated from high school in 1998, and no action this court might take would affect his or the School's rights."); *Moseley v. Bd. of Educ. of Albuquerque Pub. Sch.*, 483 F.3d 689, 693 (10th Cir. 2007) (holding that an IDEA appeal was moot because the student had graduated); *S.N. v. Old Bridge Twp. Bd. of Educ.*, 2006 WL 3333138, at *2 (D.N.J. Nov. 15, 2006) (holding that an IDEA appeal was moot because the student had relocated to another school in another state, and "Plaintiffs in this [IDEA appeal] request only prospective relief, which would be impossible to grant").

At the motion hearing before this court, Plaintiffs asserted that the appeal is not moot because it fits within the very narrow "capable of repetition, yet evading review" exception to the mootness doctrine. (Tr. at 24). That exception "applies where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration; and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *K.A. ex rel. F.A. v. Fulton Cty. Sch. Dist.*, 741 F.3d 1195, 1200 (11th Cir. 2013). Plaintiffs contend that because J.D. has lived in Arab with his grandmother in the past, "there is a real possibility he may at some point live back with his grandmother who lives in Arab." (Tr. at 24–25).

The possibility that J.D. may someday live with his grandmother in Arab is not sufficient to revive Plaintiffs' requests for injunctive relief. "The remote possibility that an event might recur is not enough to overcome mootness, and even a likely recurrence is insufficient if there would be ample opportunity for review at that time." *Hall v. Sec'y, State of Ala.*, __ F.3d __, 2018 WL 4103168, at *5 (11th Cir. Aug. 29, 2018) (quoting *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001)). Plaintiffs have not shown any actual likelihood that J.D. will return to live with his grandmother in Arab, or that if he did, Arab Primary School would resume its challenged conduct, or in the event both of those possibilities come to pass, there would not be ample opportunity for review at that time.

Plaintiffs also request monetary damages in their amended judicial complaint, seeking "compensatory damages and reimbursement for their out of pocket expenses, transportation to and from [a doctor's office], and expenses involved in moving to relocate J.D., etc." (Doc. 12 at 17). The amended complaint does not specify whether those monetary damages arise from the IDEA appeal or the other claims asserted in the complaint. (*See id.*). At the motion hearing, the court asked Plaintiffs' attorney to explain the basis for any compensatory damages sought under the IDEA. (Tr. at 26–30). Plaintiffs' counsel brought up only the fact that J.D. had missed days of school and that he had to seek mental health treatment, and he later conceded that he was not seeking compensatory damages under the IDEA for mental health treatment. (*Id.*). Accordingly, the only compensatory damages that Plaintiffs seek appear to relate to the days of school that J.D. missed.

The IDEA gives district courts authority "to grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B)(iii). But the Eleventh Circuit has held that "the IDEA's primary purpose is to ensure [a free appropriate public education], not to serve as a tort-like mechanism for compensating personal injury." *Ortega v. Bibb Cty. Sch. Dist.*, 397 F.3d 1321, 1325 (11th Cir. 2005) (quotation marks omitted) (alteration in original); *see also id.* at 1325–26 (collecting cases from the First, Second, Fourth, Sixth, Seventh, Eighth, and Ninth

Circuits holding that compensatory damages are not available under the IDEA). This is because "[t]he IDEA's central mechanism for the remedying of perceived harms is for parents to seek changes to a student's program," and other federal statutes, such as the ADA and the Rehabilitation Act, provide avenues to recover compensatory damages. *Id.* at 1325 (quoting *Polera v. Bd. of Educ.*, 288 F.3d 478, 486 (2d Cir. 2002)).

But the *Ortega* decision does not preclude the recovery of all monetary relief under the IDEA. Indeed, it acknowledges that non-"tort-like damages"—such as reimbursement of expenses—may be available. *Id.* The Eleventh Circuit has not defined the exact contours of those damages available, but they include "expenses that [the Board of Education] should have paid all along and would have borne in the first instance had it developed a proper IEP." *Sch. Comm. of Town of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369–71 (1985) (holding that the IDEA's predecessor statute grants courts the power "to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act").

Because Plaintiffs have not identified any expenses that the Board of Education should have paid if it had developed a proper IEP, the court concludes that the monetary damages Plaintiffs seek under the IDEA are not available to

them. As a result, the IDEA appeal is moot. *See Knox*, 567 U.S. at 307. Accordingly, the court **WILL DISMISS AS MOOT** the IDEA appeal.

B.    Non-IDEA Claims (ADA, Section 504, and State Law Claims)

Defendants contend that they are entitled to summary judgment on Plaintiffs' ADA and Rehabilitation Act claims because Plaintiffs have not presented evidence of intentional discrimination on the part of any defendant and that various forms of immunity protect them from Plaintiffs' state law claims. (Doc. 46 at 24–45). Plaintiffs oppose summary judgment primarily on the ground that Defendants spoliated evidence. (Doc. 50 at 17–28). They also briefly argue that the alleged IDEA violations constitute violations of the ADA and Section 504, and that immunity does not protect Defendants from liability for their criminal acts. (*Id.* at 28–44).

1.    *Spoliation of Evidence*

Plaintiffs contend that Defendants' spoliation of evidence warrants denial of the motion for summary judgment. (Doc. 50 at 17–28). They contend that they requested, but Defendants failed to produce: evidence about the modified Rifton chair; evidence of physical restraint used on J.D.; documentation about restraint training completed by teachers who "may or will have contact with" J.D.; and video and audio recordings. (*Id.* at 18).

The Eleventh Circuit has held that spoliation of evidence may warrant sanctions, including exclusion of evidence or even dismissal of a case. *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 945 (11th Cir. 2005); *see also* Fed. R. Civ. P. 37(e) (providing various remedies for failure to preserve electronically stored information that cannot be restored or replaced, if the loss of evidence prejudices another party). "[F]ederal law governs the imposition of spoliation sanctions," but the court may also look to state where the state law is "wholly consistent with federal spoliation principles." *Id*. Alabama defines spoliation as "an attempt by a party to suppress or destroy material evidence favorable to the party's adversary." *Vesta Fire Ins. Corp. v. Milam & Co. Const.*, 901 So. 2d 84, 93 (Ala. 2004); *see also Oil Equip. Co. Inc. v. Modern Welding Co. Inc.*, 661 F. App'x 646, 652 (11th Cir. 2016) ("Spoliation refers to 'the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'") (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)).

The Eleventh Circuit has not addressed the burden of proof for a party seeking spoliation sanctions, but a district court has held that the party seeking such sanctions "must prove that (1) the missing evidence existed at one time; (2) [the other party] had a duty to preserve the evidence; and (3) the evidence was crucial to [the moving party] being able to prove their . . . case." *In re*

*Delta/AirTran Baggage Fee Antitrust Litig.*, 770 F. Supp. 2d 1299, 1305 (N.D. Ga. 2011).

Plaintiffs contend that Defendants spoliated evidence about the modified Rifton chair, evidence of physical restraint used on J.D., documentation about restraint training completed by teachers who "may or will have contact with" J.D., and video and audio evidence. (Doc. at 18). Even assuming that the evidence at issue actually exists—a showing that Plaintiffs have not made—Plaintiffs have not established that the evidence was crucial to their case. Indeed, much of the evidence is irrelevant to their case.

### a. The Modified Rifton Chair

With respect to the modified Rifton chair, Plaintiffs have presented no evidence that any teacher required J.D. to sit in the modified chair instead of the unmodified chair. Nor have Plaintiffs explained how access to the modified chair would establish that the teachers required J.D. to sit in that specific chair, or how requiring him to sit in that chair instead of the unmodified chair would change the analysis of whether the timeouts violated federal or state law. Because Plaintiffs have presented no evidence or argument establishing how the absence of evidence about the modified Rifton chair negatively impacts their case, the court concludes that spoliation sanctions are not warranted for spoliation of evidence regarding the modified Rifton chair.

### b. Evidence of Physical Restraint

As to evidence of physical restraint used on J.D., Plaintiffs allege that Defendants failed to disclose every incident of physical restraint used on J.D. They do not explain how they know that evidence of undisclosed uses of physical restraint existed. *See In re Delta/AirTran Baggage Fee Antitrust Litig.*, 770 F. Supp. 2d at 1305 (requiring the movant to establish that "the missing evidence existed at one time"). Nor have they established how documentation of the use of more physical restraint is crucial to their case, given that the Alabama Administrative Code provides that a teacher may "use his or her discretion in the use of physical restraint to protect students or others from imminent harm or bodily injury." Ala. Admin. Code R. 290-3-1-.02(1)(f)(2.)(xiii). Accordingly, they have not met their burden of establishing that sanctions for spoliation of that evidence are warranted.

### c. Documentation of Restraint Training

Plaintiffs contend that they sought documentation about whether teachers at Arab Primary School were trained in or certified to use restraint on students, and Defendants failed to disclose such evidence. (Doc. 50 at 18). Again, Plaintiffs have not met their burden of establishing that spoliation sanctions are warranted because they have not demonstrated why that evidence is crucial to their case.

### d. Video and Audio Evidence

Plaintiffs contend that Defendants concealed or destroyed video and audio evidence, apparently of teachers transporting J.D. using physical restraint. (Doc. 50 at 18). They base that argument on the fact that the school had video cameras set up around the campus, but the Board did not produce videos taken from all of those cameras. (*Id.* at 18–19). At the motion hearing, however, Plaintiffs' counsel conceded that he did not know if the video he sought ever existed. (Tr. at 46).

Plaintiffs also contend that Defendants concealed video evidence that Ms. Collier and unidentified "other people" took of J.D. (Tr. at 44). Ms. Collier testified that she took some videos of J.D. on her phone, but she returned the phone on which she took that video to AT&T. (Doc. 50-1 at 12). At the motion hearing, Plaintiffs' counsel conceded that he never asked her whether she returned that phone before he made a discovery request for that video. (Tr. at 44). Accordingly, Plaintiffs have not shown that Defendants had any control over that video.

Because Plaintiffs have presented no evidence demonstrating that the video and audio that they sought ever existed or that Defendants had control over the video and audio, they have not established that Defendants spoliated that evidence. Accordingly, the court will not deny the motion for summary judgment as a sanction for spoliating evidence.

### 2. Merits of ADA and Section 504 Claims

The amended judicial complaint alleges that the Board violated the ADA and Section 504 because of the same actions that purportedly violated the IDEA. (*See* Doc. 12 at 12–13). Defendants contend that they are entitled to summary judgment on those claims because Plaintiffs have not presented evidence of intentional discrimination on the part of any defendant. (Doc. 46 at 24–29). Plaintiffs respond that a genuine dispute of material fact exists because J.D. is an individual with a disability who was denied the benefit of participating in the general education classroom. (Doc. 50 at 37–38).

The ADA and the Rehabilitation Act apply to public schools. *Fry v. Napoleon Comm. Sch.*, 137 S. Ct. 743, 749 (2017). To prevail on a claim under Title II or Section 504, a plaintiff must establish

> (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability.

*J.S.*, 877 F.3d at 985 (quotation marks omitted). "[T]o prove discrimination in the education context, something more than a mere failure to provide the 'free appropriate education' required by IDEA must be shown." *J.S.*, 877 F.3d at 985–86 (quotation marks and alterations omitted).

"A plaintiff may establish intentional discrimination by showing deliberate indifference," which is "an exacting standard; school administrators will only be deemed deliberately indifferent if their response . . . or lack thereof is clearly unreasonable in light of the known circumstances." *Id.* at 987 (quotation marks omitted) (alteration in original). Plaintiffs must also show that the officer who was deliberately indifferent had "authority to address the alleged discrimination and to institute corrective measures on the organization's behalf." *Id.* (quotation marks omitted).

Plaintiffs have presented no evidence of intentional discrimination or deliberate indifference. To the contrary, the evidence shows that after Mr. D and J.D.'s grandmother complained, Dr. Keith undertook an investigation into the allegations and sent them a report about her findings. (Doc. 49-49 at 37–38; Doc. 49-59 at 36–41). She also instructed the teachers at the school to stop using adaptive equipment like the Rifton chair when addressing students' behavioral issues. (Doc. 49-59 at 40).

To the extent that the ADA and Section 504 claims are based on the school moving J.D. to Ms. Brown's "self-contained classroom," (doc. 49-19 at 29), Plaintiffs have presented no evidence that students in Ms. Brown's classroom are isolated from general education students, and Defendants have produced evidence that those students move between the general education and special education

classrooms. (*See* Doc. 49-38 at 46–48; Doc. 49-48 at 20; Doc. 49-40 at 14–15). In addition, the email discussing reassigning J.D. to Ms. Brown's classroom states that the school did so with his grandmother's consent, and for the purpose of addressing his behavioral issues. (Doc. 49-19 at 29). Accordingly, it does not create a genuine dispute of material fact about whether the Board intentionally discriminated against J.D. based on his disability.

The court **WILL GRANT** summary judgment to Defendants and against Plaintiffs on the ADA and Section 504 claims.

### 3. State Law Claims

The second amended complaint asserts the following state law claims against the Board and the individual defendants: false imprisonment, harassment, negligence, assault, and battery. (Doc. 12 at 14). Defendants contend that the Board is entitled to sovereign immunity and the individual defendants are entitled to state agent immunity, Alabama statutory immunity, and federal statutory immunity. (Doc. 46 at 30–34, 37–44). Plaintiffs respond only that state agent immunity does not shield the defendants because they acted outside the scope of their authority and engaged in criminal activity. (Doc. 50 at 38–39).

### a. The Board of Education

The court concludes that sovereign immunity protects the Board from any state law claims raised against it. Article I, § 14 of the Alabama Constitution

provides that "the State of Alabama shall never be made a defendant in any court of law or equity." Ala. Const., art. I, § 14. The Alabama Supreme Court has repeatedly held that § 14 protects county school boards from suits based on state tort law. *See Walker v. Jefferson Cty. Bd. of Educ.*, 771 F.3d 748, 753–54 (11th Cir. 2014) (citing *Ex parte Montgomery Cty. Bd. of Educ.*, 88 So. 3d 837, 841 (Ala. 2012) and *Ex parte Hale Cty. Bd. of Educ.*, 14 So. 3d 844. 848 (Ala. 2009)). As a result, the court **WILL DISMISS** the claims against the Board of Education as barred by sovereign immunity.

### b.     The Individual Defendants

Although Defendants raised various forms of immunity, (*see* Doc. 46 at 32–34, 37–44), the court will address only state agent immunity because it resolves all of the claims against the individual defendants.

In Alabama, state agent immunity protects employees of the State "from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's . . . exercising judgment in the discharge of duties imposed by statute, rule, or regulation in . . . educating students." *Feagins v. Waddy*, 978 So. 2d 712, 716 (Ala. 2007) (quotation marks and emphases omitted). Each of the individual defendants is a state agent: Dr. Keith was the principal of Arab Primary School, Mr. Crowder was the school's special education coordinator; Ms. Cranford was J.D.'s kindergarten teacher during

at least part of the 2015–2016 school year; Ms. Putman was J.D.'s paraprofessional aide during the 2015–2016 school year; and Ms. Eddie was the school's head custodian. *See, e.g.*, *Louviere v. Mobile Cty. Bd. of Educ.*, 670 So. 2d 873, 878 (Ala. 1995) (holding that the janitor of a school was entitled to state agent immunity.

Furthermore, the actions that Plaintiffs allege constitute torts were taken in the exercise of the individual defendants' official duties. *See Feagins*, 978 So. 2d at 716. So the only question before the court is whether an exception to state agent immunity lifts Defendants' immunity from the state law claims. State agent immunity does not protect State employees "when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Feagins*, 978 So. 2d at 716 (quotation marks omitted).

Plaintiffs appear to contend that this exception lifts the bar on the state law claims because the individual defendants committed crimes against J.D. and acted contrary to the State's regulations on the use of restraint. (Doc. 50 at 38–39). But they have presented no evidence creating a genuine dispute of material fact about whether the individual defendants committed any crimes against J.D. or acted contrary to the State's regulations on the use of restraint. The court will address each individual defendant separately.

First, the court concludes that Mr. Crowder, as the school's special education coordinator, is entitled to state agent immunity. It is unclear from the amended complaint what Mr. Crowder is alleged to have done: the complaint asserts only that he was negligent in discharging his duties to make sure that his employees were not falsely imprisoning, harassing, assaulting, and battering J.D. (Doc. 12 at 14). Plaintiffs presented no evidence or argument about Mr. Crowder in particular. Accordingly, because Plaintiffs have presented no evidence to show that Mr. Crowder acted outside his authority or in a criminal manner, the court **WILL DISMISS** the claims against him.

Next, the court concludes that Dr. Keith, the school's principal, is entitled to state agent immunity. As with Mr. Crowder, the amended complaint alleges only that Dr. Keith is liable for negligence in discharging her duties. (Doc. 12 at 14). But the undisputed evidence shows that, when J.D.'s family notified her of their problems with how J.D.'s teachers were treating him, she undertook an investigation, instructed the teachers to stop using the Rifton chair, and issued a report to Mr. D and Ms. Thompson. (Doc. 49-49 at 37–38; Doc. 49-59 at 36–41). Because Plaintiffs have presented no evidence to show that Dr. Keith acted outside of her authority or in a criminal manner, the court **WILL DISMISS** the claims against her.

Likewise, the court concludes that Ms. Eddie, the school's head custodian, is entitled to state agent immunity. The sole allegation against her is that on March 30, while J.D. was sitting in the front office, she "kicked" him. (Doc. 12 at 15). But the video evidence of the incident refutes that allegation. (*See* Exh. G-2 at 00:15–00:24). Even viewing the evidence in the light most favorable to Plaintiffs and drawing all inferences in their favor, Ms. Eddie's action in the video is not a kick. *See* Kick, Webster's Third New International Dictionary Unabridged (Philip Babcock Gove ed. 1971) ("[A] *blow* or sudden *forceful* thrust with the foot and esp. the toe.") (emphases added). Accordingly, Plaintiffs have failed to present any evidence that she acted outside of her authority or in a criminal manner, and the court **WILL DISMISS** the claim against her.

The last two defendants are Ms. Putman, J.D.'s paraprofessional aide, and Ms. Cranford, J.D.'s special education teacher. Plaintiffs make no specific argument about their entitlement to state agent immunity, (*see* Doc. 50 at 38–39), but the court assumes Plaintiffs base their objection to immunity on Ms. Putman's use of the Rifton chair and transport restraint, and Ms. Cranford's use of the Rifton chair.

Alabama Administrative Rule 290-3-1.02(1)(f) addresses various forms of restraint, only two of which are relevant to this case. First, the rule defines "mechanical restraint" as "[t]he use of any device or material attached to or

adjacent to a student's body that is intended to restrict the normal freedom of movement and which cannot be easily removed by the student."  Ala. Admin. Code R. 290-3-1-.02(1)(f)(1.)(ii).  Alabama prohibits the use of mechanical restraint in public schools and educational programs.  *Id.*  Plaintiffs contend that the use of the Rifton chair to put J.D. in timeouts was a prohibited use of a mechanical restraint.  (Doc. 50 at 14).

The other form of restraint relevant to this case is "physical restraint," which Rule 290-3-1.02(1)(f) defines as "[d]irect physical contact from an adult that prevents or significantly restricts a student's movement," but excludes from that definition "providing limited physical contact and/or redirection to promote student safety or prevent self-injurious behavior, . . . providing guidance to a location . . . or providing limited physical contact as reasonably needed to prevent imminent destruction to school or another person's property."  Ala. Admin. Code R. 290-3-1-.02(1)(f)(1.)(iii).  Physical restraint is generally prohibited in Alabama public schools, with limited exceptions.  Ala. Admin. Code R. 290-3-1-.02(1)(f)(2.)(v).  Plaintiffs appear to contend that the transport restraint is a prohibited form of physical restraint.  (Doc. 50 at 15).

The court rejects any contention that a violation of these sections would lift state agent immunity from the individual defendants.  First, the rule prohibiting various forms of restraint also provides that "[n]othing in this rule shall be

construed to eliminate or restrict the ability of an employee of a school system, school or program to use his or her discretion in the use of physical restraint to protect students or others from imminent harm or bodily injury."  Ala. Admin. Code R. 290-3-1-.02(1)(f)(2.)(xiii).  Further, the rule provides that "[n]othing in this rule shall be construed to create a criminal offense or a private cause of action against any local board of education or program or its agents or employees."  *Id.*  The court reads that provision to mean that a violation of the regulation is not an act that lifts the protection of state agent immunity from the individual defendants.

In addition, the court notes that, although Ms. Cranford and Ms. Putman were involved in using the Rifton chair for timeouts, there is no evidence that either of them used transport restraint to move J.D. to the front office.  On March 30, the school employees who moved J.D. to the front office were Ms. Brown and Ms. Spencer, neither of whom is a defendant in this case.  (*See* Exh. G-1 at 20:44–20:58; Doc. 49-1 at 35; Doc. 49-49 at 42).  And even if they had transported J.D. in that manner, Alabama regulations expressly grant school employees discretion to "use . . . physical restraint to protect students or others from imminent harm or bodily injury."  Ala. Admin. Code R. 290-3-1-.02(1)(f)(2.)(xiii).

Accordingly, the court **WILL DISMISS** the claims against Ms. Putman and Ms. Cranford because state agent immunity bars those claims.

## III. CONCLUSION

The court **WILL GRANT** Defendants' motion for summary judgment.

The court **WILL DISMISS AS MOOT** Plaintiffs' appeal of the IDEA complaint because J.D. is no longer a student at the Arab Primary School. The court **WILL DISMISS WITHOUT PREJUDICE** the state law claims against the Board of Education because sovereign immunity bars those claims. The court **WILL DISMISS WITHOUT PREJUDICE** the state law claims against Ms. Cranford, Ms. Putman, Ms. Eddie, Dr. Keith, and Mr. Crowder because those defendants are entitled to state agent immunity.

The court has jurisdiction only over the ADA and Section 504 claims. The court **WILL GRANT SUMMARY JUDGMENT** in favor of the Board of Education and against Plaintiffs on Plaintiffs' ADA and Section 504 claims.

The court will enter a separate order and final judgment consistent with this opinion.

**DONE** and **ORDERED** this September 26, 2018.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE